W. Willard **WIRTZ**, Secretary of Labor, United States Department of Labor, Plaintiff,

v.

**NATIONAL MARITIME UNION OF AMERICA**, Defendant.

No. 66 Civ. 4519.

United States District Court
S. D. New York.
April 19, 1968.

See also, D. C., 272 F.Supp. 68.

Robert M. Morgenthau, U. S. Atty., by Arthur S. Olick and Michael D. Hess, Asst. U. S. Attys., New York City, for plaintiff.

Abraham E. Freedman, New York City, for defendant.

## OPINION

MOTLEY, District Judge.

This is an action brought by the Secretary of Labor to set aside the April-May 1966 election of officers of the National Maritime Union of America (NMU). The Secretary's authority and the jurisdiction of this court stem from Title IV of the Labor Management Reporting and Disclosure Act of 1959 (LM RDA), 29 U.S.C. § 482(b).[1]

1. This section provides:
 The Secretary shall investigate such complaint and, if he finds probable cause to believe that a violation of this subchapter has occurred and has not been remedied, he shall, within sixty days after the filing of such complaint, bring a civil action against the labor organization as an entity in the district court of the United States in which such labor organization maintains its principal office to set aside the invalid election, if any, and to direct the conduct of an election or hearing and vote upon the removal of officers under the supervision of the Secretary and in accord-

The Secretary's complaint was filed after an investigation during which he found probable cause to believe that the NMU had violated two sections of the LMRDA, i. e., 29 U.S.C. § 481(a) and (e).[2] His investigation resulted from complaints filed by four members of NMU who had exhausted their remedies within the union and, within one calendar month thereafter, had filed complaints with the Secretary alleging violations of the LMRDA.[3]

After a trial, this court finds and concludes:

1) all of the complaining members exhausted their internal remedies but only three complained to the Secretary of the issues raised by him in this action; 2) NMU's self-nominating requirements, enforced against anti-administration candidates during the 1966 election, and NMU's prior office holding requirement, which is a prerequisite for holding national office, violate 29 U.S.C. § 481(e); 3) there exists a reasonable probability that these violations may have affected the outcome of the election; and 4) failure to elect the field patrolman in Panama, the branch agent in Yokohama, the officials in charge of the ports in Greenville, Memphis, Joliet and Paducah, and the patrolmen violated 29 U.S.C. § 481 (a). This court, therefore, declares NMU's 1966 election void and directs the conduct of a new election, under the supervision of the Secretary, so far as law-

ance with the provisions of this subchapter and such rules and regulations as the Secretary may prescribe. The court shall have power to take such action as it deems proper to preserve the assets of the labor organization.

2. 29 U.S.C. § 481(a) provides:
Every national or international labor organization, except a federation of national or international labor organizations, shall elect its officers not less often than once every five years either by secret ballot among the members in good standing or at a convention of delegates chosen by secret ballot.

29 U.S.C. § 481(e) provides:
In any election required by this section which is to be held by secret ballot a reasonable opportunity shall be given for the nomination of candidates and every member in good standing shall be eligible to be a candidate and to hold office (subject to section 504 of this title and to reasonable qualifications uniformly imposed) and shall have the right to vote for or otherwise support the candidate or candidates of his choice, without being subject to penalty, discipline, or improper interference or reprisal of any kind by such organization or any member thereof. Not less than fifteen days prior to the election notice thereof shall be mailed to each member at his last known home address. Each member in good standing shall be entitled to one vote. No member whose dues have been withheld by his employer for payment to such organization pursuant to his voluntary authorization provided for in a collective bargaining agreement shall be declared ineligible to vote or be a candidate for office in such organization by reason of alleged delay or default in the payment of dues. The votes cast by members of each local labor organization shall be counted, and the results published, separately. The election officials designated in the constitution and bylaws or the secretary, if no other official is designated, shall preserve for one year the ballots and all other records pertaining to the election. The election shall be conducted in accordance with the constitution and bylaws of such organization insofar as they are not inconsistent with the provisions of this subchapter.

3. 29 U.S.C. § 482(a) provides:
A member of a labor organization—
(1) who has exhausted the remedies available under the constitution and bylaws of such organization and of any parent body, or
(2) who has invoked such available remedies without obtaining a final decision within three calendar months after their invocation,
may file a complaint with the Secretary within one calendar month thereafter alleging the violation of any provision of section 481 of this title (including violation of the constitution and bylaws of the labor organization pertaining to the election and removal of officers). The challenged election shall be presumed valid pending a final decision thereon (as hereinafter provided) and in the interim the affairs of the organization shall be conducted by the officers elected or in such other manner as its constitution and bylaws may provide.

ful and practicable in conformity with those applicable provisions of the Constitution and By-Laws of NMU, except as to those provisions of the Constitution which this court finds herein violate 29 U.S.C. § 481(a) and (e). 29 U.S.C. § 482(e).[4]

### Findings of Fact and Conclusions of Law

#### 1. *The Structure of NMU*

The NMU was founded in 1937 when its organizers disagreed with and withdrew from the International Seamen's Union. It has a total membership of approximately 47,500. NMU is composed principally of unlicensed seamen who serve on board American flag vessels sailing from all coasts, the Great Lakes, and various rivers of the United States. It is organized on a nation-wide basis. It has subdivisions known as branches and sub-branches headed by a branch agent or field patrolman who is elected by the entire membership. (NMU Constitution, 1965, Art. 7, Sec. 17; Art. 13, Sec. 5.). It does not have locals which elect local officers. We are, therefore, not concerned in this case with the eligibility requirements for officers in union locals. We are concerned here with the election of 8 national officers, i. e., president, secretary-treasurer, 3 vice presidents, 3 national representatives. In addition, the election involved 13 branch agents and 13 field patrolmen. We are also concerned with the question whether the branch agent in Yokohama, the field patrolman in Panama, the officials in charge of the ports in Greenville, Memphis, Joliet and Paducah, and all of the 73 patrolmen should have been elected.

NMU bargains collectively with the federal government and shipping companies which operate locally as well as nationally and internationally. These collective bargaining agreements cover unlicensed personnel employed by the federal government and various shipping companies engaged in interstate and foreign commerce; NMU is, consequently, covered by Title IV of the LMRDA. 29 U.S.C. § 402 (i), (j). NMU operates through 33 port offices or branches located on the Atlantic and Pacific coasts, on the major rivers and lakes, and in Puerto Rico, Panama, the Canal Zone and Yokohama, Japan. There is usually a port agent or a field patrolman assigned to each port or branch. Port agents and field patrolmen are required by the NMU Constitution to be elected. Prior to 1963, patrolmen were also required by the Constitution to be elected. Patrolmen are now appointed by the national president, subject to approval by the national office. There are presently 73 patrolmen appointees.

NMU has a national convention every three years during the month of October, attended by elected delegates, which is the supreme governing authority of the union. The national council, composed of the 8 national officers, all officers in charge of ports, and one representative from each labor organization, chartered in accordance with Art. 7, Sec. 11, of the Constitution, is the governing body of NMU between conventions. The national office, which is composed of the 8 nation-

---

4. This section provides:
 (c) If, upon a preponderance of the evidence after a trial upon the merits, the court finds—
 (1) that an election has not been held within the time prescribed by section 481 of this title, or
 (2) that the violation of section 481 of this title may have affected the outcome of an election,
 the court shall declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary and, so far as lawful and practicable, in conformity with the constitution and bylaws of the labor organization. The Secretary shall promptly certify to the court the names of the persons elected, and the court shall thereupon enter a decree declaring such persons to be the officers of the labor organization. If the proceeding is for the removal of officers pursuant to subsection (h) of section 481 of this title, the Secretary shall certify the results of the vote and the court shall enter a decree declaring whether such persons have been removed as officers of the labor organization.

al officers, is the governing body of NMU between meetings of the national council. (NMU Constitution, 1965, Art. 5, Secs. 2, 3, 4).

NMU has chartered, in accordance with Art. 7, Sec. 11, of its Constitution (1965), two affiliates: The Brotherhood of Marine Officers and the United Marine Division (apparently consisting of tug boat workers). These are autonomous groups which elect their own officers. The officers elected by these affiliates are not involved in this action. NMU members do not participate in the election of the representative of these affiliates who sit on NMU's national council. There is no challenge here involving the elective representatives of these affiliates to the national council. These affiliates did not participate in NMU's general election of 1966.

2. *The 1966 Election of Officers*

The 1966 election of officers was conducted between April 1 and May 31, 1966, by the Honest Ballot Association. There was balloting in 32 ports, 28 of them in the continental United States; the others were in San Juan, Puerto Rico, Panama and Christobal, Canal Zone and in Yokohama, Japan. There were 34 officers elected—8 national officers, 13 branch agents, and 13 field patrolmen. There were 46 candidates on the ballot for these 34 positions. Polls were open in each port from 9 A.M. to 5 P.M., Monday through Friday.

The results of the 1966 election of officers were as follows:

## NATIONAL OFFICERS

### NATIONAL PRESIDENT

| | | |
|---|---|---|
| Joseph Curran | (Unopposed) | 16,537 |

### NATIONAL SECRETARY-TREASURER

| | |
|---|---|
| Shannon J. Wall | 11,205 |
| James M. Morrissey | 5,875 |

### VICE-PRESIDENTS (3)

| | |
|---|---|
| Mel Barisic | 12,424 |
| James Martin | 12,005 |
| Rick Miller | 11,498 |
| Joseph Padilla | 6,133 |

### NATIONAL REPRESENTATIVES (3)

| | | |
|---|---|---|
| Robert Nesbitt | (Unopposed) | 13,292 |
| Peter Bocker | " | 12,462 |
| Leo Strassman | " | 12,285 |

## AGENTS

### BOSTON

| | |
|---|---|
| Gordon Humphrey | 12,988 |

### NEW YORK

| | |
|---|---|
| Joseph Labaczewski | 11,406 |
| Gaston Firmin-Guyon | 4,569 |

### PHILADELPHIA

| | | |
|---|---|---|
| Louis Parise | (Unopposed) | 13,870 |

### BALTIMORE

| | | |
|---|---|---|
| Thomas Martinez | (Unopposed) | 14,394 |

### NORFOLK

| | | |
|---|---|---|
| James Q. Rice | (Unopposed) | 13,817 |

### MOBILE

| | | |
|---|---|---|
| Layton Overstreet | (Unopposed) | 13,661 |

### NEW ORLEANS

| | |
|---|---|
| S. D. "Tex" George | 9,600 |
| Harry Alexander | 5,509 |

### GALVESTON

| | | |
|---|---|---|
| John T. Kelly | (Unopposed) | 13,537 |

### PORT ARTHUR

| | |
|---|---|
| Joseph Patton | 10,180 |
| Richard Flanagan | 4,261 |

### HOUSTON

| | | |
|---|---|---|
| Kirby-Smith McDowell | (Unopposed) | 13,476 |

### CHICAGO

| | |
|---|---|
| William Neill | 9,617 |
| Thomas Monaghan, Jr. | 4,104 |

### PITTSBURGH

| | |
|---|---|
| Joseph V. Reddy | 9,370 |
| Amelda Perry | 4,304 |

### ST. LOUIS

| | | |
|---|---|---|
| John C. Hughes | (Unopposed) | 12,784 |

FIELD PATROLMEN (13)

| | |
|---|---|
| Jerome Zimmer | 11,174 |
| Edward J. Dwyer | 11,079 |
| John J. Sheehan | 10,917 |
| James McKinley | 10,913 |
| Manuel Peters | 10,685 |
| Michael McNerney | 10,616 |
| Guillermo Ryan | 10,558 |
| Woodrow P. Nayer | 10,520 |
| Ralph Turchiano | 10,330 |
| Albert Jackson | 10,099 |
| John Edward Riezinger | 9,929 |
| Max Sykalski | 9,570 |
| Louis Streho | 9,016 |
| James O. Bennett | 6,507 |
| Jack E. Burtis | 5,019 |
| Guillermo Cuadra | 4,517 |
| Bobby W. Cawthorne | 4,629 |
| Basilio Trujillo | 4,630 |

There is no challenge in this case to the manner in which the balloting was conducted. There is likewise no dispute with respect to the result attributed to each candidate. The challenge here is to: 1) the procedures for nominating candidates for office; 2) the eligibility requirements for office; and 3) the failure to hold an election for certain offices.

3. *Crucial Amendments to the NMU Constitution*

Prior to enactment of the LMRDA in 1959, the NMU Constitution then in force contained the following relevant eligibility requirements for *all* offices:

Any member who has been in good standing continuously for one (1) year immediately preceding the election * * * shall be eligible to hold office * * *. (Art. 9, Sec. 1.)

Following enactment of the LMRDA in 1959, the Constitution was amended in 1960. The first pertinent amendment was a prior office holding requirement which was made a condition precedent to eligibility for each of the 8 national offices.

The amendment provided:

Any member who has been in good standing continuously for one (1) year immediately preceding the election * * * and has served at least one (1) full term as a Branch Agent, Field Patrolman or Patrolman, shall be eligible to hold a National Office. * * * (Art. 9, Sec. 1(b).)

In 1960, the Constitution was also amended to provide for a 4 year term for each office as opposed to the prior 2 year term. (Art. 11, Sec. 3.) The 1959 Constitution did not contain a specific term of office provision. The fact that officers were elected every two years prior to 1960 is gleaned from the evidence of such elections and the section of the 1959 Constitution dealing with nomination of officers which provided:

Biennially during the month of February there shall be nominated, from ship and shore, candidates for office * * *. (Art. 10, Sec. 1).

The 1959 Constitution listed "the officers to be elected in the general elections" as follows:

1. National President
2. National Secretary-Treasurer
3. Three Vice-Presidents
4. Three National Representatives
5. Branch Agents for each Branch
6. Field Patrolmen
7. Patrolmen
8. All other permanent officers of whatever description. (Art. 11, Sec. 1.)

The 1960 Constitution made a change which divided the officers into two categories as follows:

ARTICLE 11

*Section 1*—National Officers: National Officers of the NMU shall consist of:

(1) National President
(2) National Secretary-Treasurer
(3) Three (3) Vice-Presidents
(4) Three (3) National Representatives

*Section 2*—Other Officers: The other officers shall consist of:

(1) A branch agent for each branch
(2) Field Patrolmen as numerically and geographically determined by the National Council.

(3) Patrolmen as numerically and geographically determined by the National Council.

In 1963, the Constitution was amended to provide that patrolmen "shall be appointed by the National President with the approval of the National Office", rather than elected. (Art. 11, Sec. 2.)

In 1963, the Constitution was also amended to provide that, "[a]ll officers, except Patrolmen", shall be elected for a term of four years. (Art. 11, Sec. 3.) No term of office for patrolmen was specified. The description of the duties of patrolman contained in the 1960 Constitution, however, remained the same. (Art. 13, Sec. 6.)

In 1965, NMU's Constitution was once again amended. This was the Constitution in effect at the time of the controverted election of 1966. The 1965 amendments did not affect the classification of officers, the existing prior office holding requirement for the 8 national offices, the appointment of patrolmen, or term of office of patrolmen. These remained the same. (Art. 9, Sec. 2, Art. 11, Secs. 1, 2, 3.) This time the Constitution was amended to change the one-year membership requirement for office. This amendment provided that all candidates for office must have been "members in good standing continuously *for five years* immediately preceding nomination." (Art. 9, Secs. 1 and 2.) (Emphasis added.)

In addition, the Constitution was amended to provide that *all* candidates for office must "show proof of Group 1 shipping status or equivalent sailing time on NMU contract vessels for each of the *five (5) years* preceding nomination, provided that time spent ashore by members holding office or engaged in official union business shall be considered as sailing time for the purpose of this section * * *". (Art. 9, Secs. 1 and 2.) (Emphasis added.)

In 1966, in order to acquire Group 1 shipping status, one of the essential prerequisites was that one must have been employed as an unlicensed seaman for at least 200 days, in the aggregate, in the three-year period immediately preceding the date of application.[5] After January 1, 1963, in order to maintain Group 1 status, after its initial acquisition, an unlicensed seaman must have been employed as such for at least 200 days during the previous three calendar year period on specific type vessels having contracts with NMU.[6]

In 1963, the NMU Constitution provided that: "A candidate for any office must have been on board NMU contract vessels for a period of not less than 200 days in *the last three (3) years* immediately prior to nomination; provided that this requirement shall not apply to candidates holding office or to members engaged in official Union business at the time of nomination." (Art. 9, Sec. 3(b). (Emphasis added.)

The 1963 Constitution also provided that: 1) "A candidate for national office must show proof of three (3) full years of sailing time on American-flag Deep Sea, Great Lakes, Inland Waters or Harbor Craft * * *"; and 2) "A candidate for any other office must show proof of three (3) full years of sailing time on American-flag water craft in that area of the industry (Deep Sea, Lakes, or Rivers), served by the office for which he is a candidate." (Art. 9, Sec. 3(a).)

In short, after enactment of the LMRDA in 1959, NMU, by a series of amendments to its Constitution, accomplished two results relevant to this litigation: 1) it made more stringent the requirements for nomination for office; and 2) it significantly reduced the number of elective office positions by making patrolman positions appointive.

---

5. Agreement Between Various Tanker Companies And The National Maritime Union of America, As Amended 1965, p. 55 (Plaintiff's Exhibit 46).

6. Id. p. 56.

#### 4. *Nominating Procedures*

The NMU Constitution in effect during the 1966 election required that candidates for office be nominated by means of signed endorsements obtained from members in good standing. Endorsements of not less than 100 members in good standing were required if a member was attempting to qualify as a candidate for national office. In the case of members seeking nomination to the positions of port agent or field patrolman, not less than 25 signatures of members in good standing were required. No endorsement was deemed valid unless obtained in the month of February preceding the election. (Art. 10, Sec. 2.)

Every candidate was required to personally appear, during the month of February, before a Port Verification Committee. This Committee consisted of an elected official and four members in good standing. The prospective candidate was required to submit, upon official forms obtainable at any port office, his qualifications, for verification by the Committee. Only the endorsement forms obtainable from any NMU port could be used. These forms were available at any time after January 1, 1966.

In addition to presenting required endorsements, the candidate was required to present to the Committee: 1) his written acceptance of the nomination; 2) a signed application for his bond; 3) an affidavit asserting that the candidate had not been convicted of a crime (as defined in Article 9, Section 4 of the Constitution;[7] 4) an affidavit asserting that he had not been a member of or affiliated with the Communist Party or any other subversive organization in the five years preceding the nomination; 5) a recent full-face photograph; 6) written evidence of Group 1 shipping status or equivalent sailing time as required by Art. 9, Sec. 1 of the Constitution; and 7) a written record of the candidate's union activities, including his strike record, stating strike participated in, number of days picket duty, and where his strike clearance was obtained. (Art. 10, Sec. 2.)

After the Port Verification Committee was satisfied that a candidate was qualified for nomination, it had to promptly execute and cause to be delivered to the national secretary-treasurer, a Certificate of Verification over the signature of each member of the Committee. A duplicate copy of the signed Certificate had to be presented to the candidate. Upon receipt of the signed Certificate, the candidate was required to personally file with the national secretary-treasurer or deliver by registered mail (postmarked no later than 11:59 P.M., February 28) all of the documents referred to above which had been presented to the Verification Committee (Art. 10, Sec. 3).

The secretary-treasurer was then obligated to submit to the national office, at its duly constituted regular or special meeting, all qualifying documents together with their accompanying registered mail envelopes. (Art. 10, Sec. 4.) The national office was the ultimate judge of the qualifications of each candidate. (Art. 10, Sec. 5.) The national office reviewed the documents previously examined by the various Verification Committees and, if found to be in good order, the candidate was declared nominated.

After complying with the nominating procedures, the four union members who subsequently complained to the Secretary were declared nominated, with one exception. Richard Haake, who sought election to the presidency of NMU, was declared ineligible for nomination on the ground that he failed to meet the prior office holding requirement.

#### 5. *Exhaustion of Union Remedies*

After the 1966 election, and within the time prescribed by the Constitution, four members in good standing (Harry Alex-

---

7. The evidence shows that the forms did not advise prospective candidates that they were disqualified only if convicted of a felony after they became members of N.M.U.

ander, James Morrissey, Richard Haake, and Joseph Padilla) filed protests with the union. (Art. 12, Sec. 22.) These protests were heard by three judges elected by the members and three judges elected by the Honest Ballot Association. A hearing was afforded each complaining member, followed by an adverse decision. (Art. 12, Sec. 22.) These members appealed to the national council, which, after a hearing, also ruled against each complainant. The same affidavits which the complaining members were required by the Constitution to file with the judges of the election and the national council were then filed, within 30 days after the national council's decision, with the Secretary. He then instituted an investigation and, upon finding probable cause to believe that the LMRDA had been violated, filed the present action. The Secretary was required by the LMRDA to file his action within 60 days after receipt of the members' complaints. 29 U.S.C. § 482(b). However, this requirement was waived by NMU.

■ One of the complaining union members, Harry Alexander, ran for the office of branch agent in New Orleans. He was defeated. He complained of none of the violations of the LMRDA which the Secretary presents in this action. The Secretary is, therefore, precluded from bringing this action based upon Mr. Alexander's complaint. Wirtz v. Hotel, Motel and Club Employees Union, Local 6, 381 F.2d 500 (2d Cir. 1967), cert. granted, 390 U.S. 919, 88 S.Ct. 852, 19 L.Ed.2d 979 (1968).

James Morrissey, who had been an NMU member for 24 years, ran unsuccessfully for the office of national secretary-treasurer. His affidavit protesting the election raised the following issue, reiterated by the Secretary: the requirements for nomination to union office are unreasonably restrictive in that they deprived him and other union members in good standing of the right and opportunity to nominate other candidates for the various union offices.

Morrissey's protest was filed on June 13, 1966, but on June 25, 1966, he filed a supplementary appeal in which he raised the following issues relevant to this decision: 1) the failure to elect the patrolman and the officers in charge of the ports in Yokohama and Panama; 2) the improper denial of the right of another union member, Garret Eylders, to run for national representative on the ground that he failed to meet the prior office holding requirement; 3) the denial to certain members of an opportunity to vote by limiting voting to specific ports in a specified 60 day period. Numerous other issues were raised by Mr. Morrissey in his protest which are not here raised by the Secretary and consequently not involved in this action.

Richard Haake sought nomination for the position of national president. He was denied the right to be a candidate for the presidency because he previously had not held office as a national officer, branch agent, field patrolman or patrolman. On February 28, 1966, prior to the election, Haake protested his disqualification by the Port Verification Committee to the national secretary-treasurer. Haake's disqualification was sustained by the national office. He filed a post-election protest alleging, *inter alia,* that: 1) members were denied the right to nominate him or others for office; 2) members were denied the right to vote for patrolmen; 3) the agents in Panama and Yokohama were not elected; 4) the 60 day voting time served to disenfranchise great numbers of members; 5) Eylders was not allowed to run for national office; 6) the Constitution had been changed to make it difficult for opposition candidates. Numerous other issues were raised by Haake in his protest which are not raised here by the Secretary.

Joseph Padilla lost his bid for one of the three vice-president positions. Mr. Padilla likewise raised many issues in his protest. However, the Secretary has placed in issue here only the following of such issues: 1) failure to elect the field patrolmen in Panama and in Yokohama, Japan; 2) patrolmen were not elected; 3) absentee voting was not permitted.

...he NMU contends: 1) there could not have been compliance with the requirement that union remedies be exhausted since no complaining member had sought nomination for patrolman and none had requested an absentee ballot; and 2) only a candidate whose own election is affected by any alleged violation of the LMRDA can complain to the union. The Secretary's position is that: 1) *any* union member may, after an election, complain to the union about *any* alleged violation of the LMRDA; then, if he exhausts his union remedies, he may complain to the Secretary; and 2) the court may set aside the election if it finds that there was such a violation and that there exists a reasonable probability that the violation may have affected the outcome of *any* election.

■ This court believes the Secretary's reading of the statute is correct. The statute is a post-election remedy. Wirtz v. Teamsters Industrial and Allied Employees Union Local No. 73, 257 F. Supp. 784, 792 (N.D.Ohio, 1966). There is no requirement that internal remedies be exhausted *before* the election. Thus, a union member is not required to make the futile attempt to be nominated for patrolman or request an absentee ballot before election. It is sufficient if, after the failure of the union to elect patrolmen or to furnish absentee ballots, a complaining member complains to the NMU, exhausts his union remedies, and then complains to the Secretary within the prescribed times. And any union member, whether or not a candidate, may (having exhausted his union remedies) complain about *any* violation of LMRDA.

■ A new election is to be held if there exists a "reasonable probability" that any such violation of the LMRDA may have "affected" the outcome of the election of any union officer. See Wirtz v. Local Unions 410, 366 F.2d 438, 443 (2d Cir. 1966). It would be a narrow reading of the LMRDA to conclude that the statute allows a new election only if the violation affected the outcome of the

complaining union member's race for office. Were this reading correct, no union member, except the candidate, could complain about a deprivation of a right to nominate, to vote, or to otherwise support candidates, all rights protected by 29 U.S.C. § 481(e). It would be contrary to the purpose of the LMRDA "to view the Act as designed merely to protect the right of a union member to run for a particular office in a particular election. * * * the Act is not so limited, for Congress emphatically asserted a vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member." Wirtz v. Local 153, 389 U.S. 463, 475, 88 S.Ct. 643, 650, 19 L.Ed.2d 705 (1968). "The Act was not designed merely to protect the right of a union member to run for a particular union office in a particular election." Wirtz v. Local Union No. 125, 389 U.S. 477, 483, 88 S.Ct. 639, 642, 19 L.Ed.2d 716 (1968).

We are not faced, in this case, with alleged violations raised by the Secretary which were not raised before the union. Compare, Wirtz v. Hotel, Motel and Club Employees Union Local 6, supra; Local Unions No. 545, 545–A, 545–B and 545–C, International Union of Operating Engineers v. Wirtz, 381 F.2d 448 (2d Cir. 1967). The protests filed with the union, and thereafter with the Secretary, contain every element at issue in this litigation.

Thus, this court concludes that the following issues have been properly presented: 1) Whether any of NMU's nominating procedures violated Section 481 (e); 2) Whether NMU's failure to provide for absentee balloting violated Section 481(e); 3) Whether any of NMU's requirements for eligibility for office violated Section 481(e); 4) Whether NMU's failure to elect a field patrolman in Panama, a port agent in Yokohama, the officials in charge of the ports at Greenville, Memphis, Joliet and Paducah, and all of the patrolmen violated Section 481(a).

### 6. *The Self-Nominating Procedures Violated Section 461(e).*

The Secretary claims that NMU's nominating procedures constituted unreasonable restrictions on the rights of members to nominate candidates and to stand for office. The restrictions are claimed to be unreasonable in that: 1) nominations could only be made in February; 2) 100 endorsements were necessary to run for national office; 3) endorsements had to be on official union forms; 4) candidates had to personally appear before a Port Verification Committee; 5) individuals could only nominate themselves; and 6) nomination procedures were discriminatory in that those on the "Administration Slate" were not required to personally fill out the forms and get the endorsements, whereas, every one who challenged the "Administration Slate" was required to individually fill out forms and secure endorsements.

■ Union members, in their post-election protests, complained, with varying degrees of specificity, about the nominating procedures. The Secretary was entitled to challenge the nomination procedures on these grounds. Congress could not have intended that the Secretary's "right to relief be defined by a complaining member's ignorance of the law or the facts or by the artlessness of the member's protests." Wirtz v. Local Union No. 125, 389 U.S. 477, 485, 88 S. Ct. 639, 643, 19 L.Ed.2d 716 (1968); cf. Wirtz v. Local Union 169, 246 F.Supp. 741, 751–752 (D.Nev.1965). The union "had a fair opportunity to consider and redress," these alleged violations of the LMRDA. Wirtz v. Local Union No. 125, supra, 389 U.S. at 484, 88 S.Ct. at 643.

We come now to the validity of these restrictions. Title 29, U.S.C. Section 481 (e) provides, in pertinent part:

"* * * reasonable opportunity shall be given for the nomination of candidates and every member in good standing * * * shall have the right to vote for or otherwise support the candidate or candidates of his choice * * *."

■ The evidence demonstrated that limiting nominations to the month of February was not unreasonable. NMU previously had held nominations open for two months. No nominations were received until the end of the second month. Potential candidates waited to find out who was running before securing endorsements. Even after the nomination period was limited to February, no nominations were received until the last two weeks. In light of these facts, this court holds that limiting nominations to February was reasonable.

■ The Secretary's next three contentions, that candidates for national office had to secure 100 endorsements, that endorsements had to be on official forms, and that all candidates had to personally appear before a Port Verification Committee, likewise proved weightless. This court holds that the Secretary failed to show, by a preponderance of the evidence, that these requirements were unreasonable. The record contains no evidence that the official forms requirement was unreasonable. There is only scant evidence that the requirement that a candidate personally appear before a Port Verification Committee was unreasonable. One candidate, a Mr. Bennett, was required to go from Miami to Jacksonville, Florida, which he did. No one else was shown to have had a similar problem. The requirement of 100 endorsements is tested against the evidence presented of other trade union requirements. In some cases, the endorsement of 50 locals or 15% of the membership of the union was mandatory. The court holds the requirement of 100 endorsements, in a union having about 47,500 members, to be reasonable.

■ In addition, however, as to the foregoing requirements, the court finds that the Secretary failed to prove that, if they were violations of the LMRDA, there exists a reasonable probability that they may have affected the outcome of the 1966 election. In this case, there is no evidence that any candidate failed to secure the 100 endorsements on the required forms. All candidates did manage

to appear before a Port Verification Committee. It is hard to see, therefore, how, if these requirements were violations, they affected the outcome of the election. There is absolutely no evidence that these three requirements kept any candidate from running for office or even discouraged any candidate.

The court's conclusions are quite different, however, with regard to the Secretary's other complaints about the nominating procedures. The evidence sustains the Secretary's contention that anti-administration candidates had to procure nomination forms for themselves and personally secure the necessary endorsements. No anti-administration member was allowed to secure official forms for anyone except himself and was not allowed to have anyone but himself secure signatures for his nomination. The "Administration Slate" did not procure its own nomination forms and endorsements; other members secured the forms and solicited endorsements for them. This court holds these self-nominating requirements violative of 29 U.S.C. § 481(e) in that they denied members a reasonable opportunity to nominate and support candidates of their own choosing. In addition, these self-nominating requirements were discriminatorily enforced in that only those challenging the administration were required to nominate themselves by personally securing the official forms and personally soliciting the required signatures. These self-nominating provisions were particularly unreasonable in a maritime union where, as Haake testified, potential candidates served upon ships having fewer NMU members than required to endorse a member for national office. The equal right "to nominate [is] infringed where onerous burdens drastically limit the candidates available for nomination."

Calhoon v. Harvey, 379 U.S. 134, 143, 85 S.Ct. 292, 298, 13 L.Ed.2d 190 (1964) (Mr. Justice Stewart, concurring).

Moreover, the court finds that these self-nominating requirements further violate 29 U.S.C. § 481(e), in that they resulted in failure to conduct the election in accordance with the Constitution. The NMU Constitution (1965) provided, in part:

> The membership of the National Maritime Union is guaranteed the right * * * to nominate candidates for office. * * * (Art. 3, Sec. 1.)

Only members supporting the administration could nominate candidates for office. All other members could nominate only themselves.

We have previously concluded that, as to these self-nominating requirements, proper complaints were made to the Secretary by union members who had exhausted their union remedies. Having now concluded that the requirements that members individually (except the "Administration Slate") secure the official forms themselves and seek endorsements only for themselves are violative of 29 U.S.C. § 481(e), we now reach the question whether there is a "reasonable probability" that these violations may have "affected" the outcome of the election, necessitating a new election. See Wirtz v. Local Unions 410, supra. This court holds that there is a "reasonable probability" that these violations may have "affected" the outcome of the 1966 election. One complaining member, Firmin-Guyon, unsuccessfully attempted to secure nomination forms for a friend. A retired member, Martinez, was not allowed to nominate one of his friends.[8] Thus, this self-nominating procedure operated to prevent, in at least two cases, members from nominating others.[9] It is

8. Martinez was retired, but if allowed to nominate could easily have turned in his retirement card and become, once again, a full-fledged member with the right to nominate.

9. The evidence is uncontradicted in this case that whenever someone picked up

nomination forms he was told that the forms could only be used to nominate himself. Morrissey was so instructed when he picked up a second set of forms for himself.

clear, therefore, that the self-nominating requirement excluded potential candidates from the ballot. Where potential candidates are excluded from the ballot, "there can be no tangible evidence available of the effect of this exclusion on the election." Wirtz v. Local Unions 410, supra, 366 F.2d at 443. When violations of 29 U.S.C. § 481(e) result in the exclusion of candidates from the ballot, there exists a "reasonable probability" that the outcome of the election may have been "affected" and a new election must be held. See Wirtz v. Local Unions 410, supra, at 443; Wirtz v. Local Unions 406, 254 F.Supp. 962, 966 (E.D.La. 1966).

7. *Failure to Provide for Absentee Balloting Did Not Affect Outcome of Election*

The Secretary claims that NMU's failure to provide for voting by absentee ballot violated 29 U.S.C. § 481(e). The pertinent part of the section provides:

"* * * every member in good standing * * * shall have the right to vote for * * * the candidate or candidates of his choice * * *."

 The NMU conducted its election in April and May, 1966, at various ports. There is no question that some union members were, for this entire period, at sea and thus unable to appear at ports and vote, especially those who had gone to Vietnam. Thus, failure to provide for absentee balloting was a clear violation of Section 481(e) because of the itinerant nature of the employment of seamen.

 The smallest margin of any winning candidate was 2509 votes. To declare a new election based upon the lack of an absentee voting provision, the Secretary was obligated to prove, by a preponderance of the evidence, that this fact affected the outcome of the election. Since the Secretary failed to establish the number of members who had been deprived of an opportunity to vote, and failed to present any evidence indicating that 2509 or more members were unable to reach a port during the election, there is no evidence that the lack of absentee voting may have affected the outcome of the election.

This court has found the failure to provide for absentee ballots to be a violation of 29 U.S.C. § 481(e). Because of the lack of evidence that such a violation may have affected the outcome of the election, we may not order a new election on this ground. 29 U.S.C. § 482(c). However, other violations of the LMRDA which may have affected the outcome and a failure to elect certain officers necessitate holding a new election "so far as lawful and practicable, in conformity with the Constitution and by laws" of the NMU. In Local Unions No. 545, 545–A, 545–B and 545–C IUOE v. Wirtz, 381 F.2d 448, 450 (2d Cir. 1967) the court left open the question whether in a case where a union rule is so clearly unlawful that in directing a new election the district court may determine that such a rule shall not apply to the new election. The failure to provide absentee ballots is such a rule, and this court holds it to be, under the circumstance of this case, so clearly unlawful that in holding the new election, the NMU is directed to make provision for absentee ballots for members who will not, during the period of the balloting, reach a polling place.

8. *The Prior Office Holding Requirement Violates Section 481(e)*

The Secretary contends that the five year membership and the prior office holding requirements violate the LMRDA. The relevant provisions of Section 481(e) are as follows: "* * * every member in good standing shall be eligible to be a candidate and to hold office (subject * * * to reasonable qualifications uniformly imposed) * *." The five year membership requirement applies to all offices. The prior office holding requirement applies, in addition, to the 8 national offices.

The evidence shows that NMU's membership in 1966 was approximately 47,500. On September 12, 1966, the NMU had approximately 27,328 members who had joined prior to January 1, 1961, and

approximately 20,264 members who had joined after January 1, 1961. Thus, the five-year membership requirement, alone, made about 40% of the union members ineligible for nomination to any office.

Department of Labor studies of 73 national unions, representing 89% of organized labor, show: 1) only one other union requires 5 years of membership to run for an office below the national office level; 2) only one other union requires more than 3 years membership to run for a lower echelon office; and 3) 70% of the union members studied are in unions requiring one year or less to run for local office.

What evidence there is from the 49 depositions introduced into evidence by NMU shows that most of the present national union officers were members of their respective unions for many years before they were elected to national office. NMU's five year membership requirement thus appears to have some basis in experience in the trade union movement. Although this fact does not alter the more significant fact that only NMU and one other union, the lithographers, require 5 years membership by their constitutions as a condition of local office.

■■■■ The NMU had, in 1966, 13 elected branch agents and 13 elected field patrolmen. These were all the elected lower echelon officers in a 47,500 man union. Although opinion has been expressed to the contrary, See Wirtz v. Local Unions 406, supra, 254 F.Supp. at 966, this court does not believe that the five year membership requirement, standing alone, is, in the circumstances of this case, unreasonable. This union has a relatively small number of lower level officers. NMU has no locals. It, therefore, has a right to require that the few sub-national office positions be held by long time members. The union members overwhelmingly, at the 1966 convention, following the April-May 1966 election, supported the five year membership requirement for these lesser offices. "In deciding the issue of reasonableness we must keep in mind the fact that the Act did not purport to take away from labor unions the governance of their own internal affairs and hand that governance over either to the courts or to the Secretary of Labor." Wirtz v. Hotel, Motel and Club Employees Union, Local 6, supra, 381 F.2d at p. 504. Under the circumstances of this case, the court finds and holds the five year membership requirement reasonable.

■■■ Candidates for office were required, additionally, to have Group 1 shipping status for each of the five years preceding nomination. This second requirement meant that one who had been a member for 10 years, nevertheless, would have been ineligible for office if he failed to meet the Group 1 shipping status requirement. There is no evidence in the record to show the number of members who had Group 1 shipping status or equivalent sailing time on NMU contract vessels for each of the five years preceding the 1966 nominations. And there is no evidence that any member seeking office was disqualified for failure to meet the Group 1 shipping status requirement. This requirement is also a prerequisite to membership in NMU (Constitution (1965) Art. 15, Sec. 1(b)). The requirement guarantees that one who becomes a member of NMU and one who seeks office therein is a person who earns his livelihood in the maritime industry or has a substantial attachment to that industry. This court, therefore, finds and holds that the Group 1 shipping status requirement, per se, is not an unreasonable precondition to elective office.

A different and more complex question is faced with regard to the union's requirements for the 8 national offices. In order to qualify to run for a national office in NMU, a member, in addition to meeting the five year membership and the Group 1 status requirements, must have previously served one full term, four years, in such national office or as a branch agent, field patrolman or patrolman. Although patrolmen are appointed at will, four years service as a patrolman meets the prior office holding require-

ment. The Group 1 status requirement is significant here because in order to have Group 1 status in each of the five years preceding nomination, one must have had in the beginning of that five year period at least 200 days of sailing time which, under optimum circumstances, could have been achieved in one year. Thus, it took a *minimum* of ten years in the industry before one could qualify to become a national officer in the NMU in 1966.

Of the union's approximately 47,500 members, only about 335 or less than 1% of the members met the prior office holding requirement in 1966. (401 actually met the requirement but at least 66 of these were dead or retired at time of trial). The prior office holding requirement, therefore, so drastically reduced the number of potential candidates for the 8 national offices in 1966 that the court finds and concludes that, in the absence of some significant overriding union policy consideration for the requirement, it is, prima facie, an unreasonable restriction on the right of members in good standing, who meet the other requirements, to become candidates for national office.

At the threshold, this case must be distinguished from Wirtz v. Hotel, Motel and Club Employees Union, Local 6, 381 F.2d 500 (2d Cir. 1967), cert. granted, 390 U.S. 919, 88 S.Ct. 852, 19 L.Ed.2d 979 (1968). In that case, 1700 of the union's 26,000 members were eligible for election to 31 offices. In addition, "all members in good standing for one year had the opportunity to become eligible for office by getting themselves elected to seats in the four hundred-odd Assembly." 381 F.2d at 506. In the NMU, a fraction of 1% of the members were eligible to be elected to 8 national offices. The other 47,500, to attain eligibility, must either get elected to one of the 13 port agent or 13 field patrolmen posts, open once every four years, or get themselves appointed by the president to one of the 73 positions of patrolman. If one is fortunate enough to be appointed a patrolman, one must also have the

good fortune to remain in that position for four years.

In 1960, following enactment of the LMRDA, the prior office holding requirement was added to the NMU Constitution. At the 1962 election, there was no opposition to candidates for national office. In 1966, only 2 national office candidates were opposed. However, prior to the institution of the prior office holding requirement in 1956, for example, there were contests for all 8 national offices; in 1958, for 7 of 8 national offices, and in 1960, for 6 of 8 national offices.

As previously noted, it now takes a *minimum* of 10 years to become eligible for national office. No other union studied, except possibly the International Ladies Garment Workers Union, required so much time for its members to qualify for national office. The ILGWU requires that one seeking the office of president must have held office in at least five of the preceding ten years. Of the unions studied by the Department of Labor, 72 with 61% of the membership, required 3 years *or less* membership in the union to run for national office. The depositions submitted by NMU show that many unions have elected, as national officers, members with less than 9 years membership.

NMU attempted to justify the long period of gestation for national office on the ground that the management and operation of national union affairs today are far more complex and involve the management of millions of dollars in union welfare and pension funds, as opposed to thirty years ago when this union was in its formative years. But NMU answers its own argument by pointing with pride to its widespread organization of the industry and the fact that the major gains which the union sought thirty years ago have been won. Consequently, today, the problem is largely routine contract enforcement and management of the union's welfare and pension funds, all of which are managed by a joint labor-industry board. The NMU's officers are also assisted in the management of union property holdings and other union af-

fairs by a staff of 300–400, including professional employees.

The president of the NMU described the qualities sought for national officers in his testimony as follows:

"the ability to handle men";

"the qualities of a priest";

"the qualities of a lawyer";

"the qualities of a cold-blooded administrator * * * you cannot vacillate, you cannot procrastinate; you have to be able to make decisions";

"a man who knows something about the communities, because there is a lot of political action";

"honesty";

"fairness";

"sympathy";

"patience"; and

"forbearance".

This court does not doubt that it is *these* qualities that are sought in national officers; but what relationship exists between these qualities and the prior office holding requirement was never demonstrated.

Prior service as a branch agent, field patrolman, or patrolman gives a man experience in activities at a port, on a vessel, in collecting dues, settling grievances, and in conducting organizational drives. But this experience is not used by NMU national offices—some of whom, apparently, have not sailed on vessels in the 25 or 30 years during which they have held office. The national president has been in office since 1937, when the NMU was organized.

The president of the NMU is a vice-president of the AFL-CIO; he is a member of various committees of the International Transport Federation. He testifies before many commissions concerning wage problems in government. He is one of the several trustees of the union's pension and welfare funds. He signs all contracts, when called in at the end of negotiations; vice-presidents do the actual bargaining. Where does one get the experience necessary to become a national officer—presumably, the same place the long time national office holders got their experience, by being in office and meeting the unique demands of the office as they arise. Branch agents, field patrolmen, and patrolmen, acquire no experience in being a vice-president of the AFL-CIO, serving on committees of an international federation, testifying before commissions or performing any of the other tasks which the national officers perform. This court has been shown nothing in the duties or experience of the agents or patrolmen which would qualify them to handle the unique national office positions. The national officers do not, themselves, operate the vast NMU empire. To assist the national officers, the NMU maintains a staff of lawyers, economists, pension administrators, other staff experts in Washington, doctors, and supervisory staffs of union-owned buildings and real estate. The national officers carry out the policies determined by the national conventions and the national council.

Forty-nine depositions were offered in evidence in this case by the union. These were depositions taken of officers of forty-nine other unions, 37 of which are among those studied by the Labor Department. The purpose of the testimony elicited by these depositions was to prove that NMU's requirements for office are reasonable in light of the experience of the American trade union movement. These depositions do show that most union officers now have considerable experience. However, the depositions show that almost without exception the unions studied had, as officers, persons who had either: 1) become local officers before they had been union members five years; or 2) had been elected national officers with less than four years service as an elected local officer; or 3) both.

Even if this evidence were to show that five years of membership and four years of prior office holding were the usual attributes of union officers and, therefore, reasonable, the evidence also shows that the two conditions are not usually constitutional requirements. The

evidence shows that to get experienced officers, the lengthy eligibility requirements of the NMU need not be imposed as a matter of constitutional authority. The court does not find that the experience of other unions as shown by the depositions detracts from this finding.

The court is convinced that there is no significant overriding union policy consideration which justifies the prior office holding requirement in this case. Some period during which experience in union affairs is acquired may be imposed, but the prior office holding requirement, especially when added to the other prerequisites, has not been justified here.

The prior office holding requirement must also be considered in the light of the purpose of the Congress in enacting the LMRDA. Wirtz v. Local 153, 389 U.S. 463, 468, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968). Fortunately, the legislative history of the Act is not lacking in pointed relevant statements of the abuses for which Congress intended a remedy. One excerpt will suffice:

> Like other American institutions some unions have become large and impersonal; they have acquired bureaucratic tendencies and characteristics; their members like other Americans have sometimes become apathetic in the exercise of their personal responsibility for the conduct of union affairs. In some few cases men who have risen to positions of power and responsibility within unions have abused their power and neglected their responsibilities. In some cases the structure and procedures necessary for trade unions while they were struggling for survival are ill adapted to their new role and to changed conditions; they are not always conducive to efficient, honest, and democratic practices. U. S. Code Congressional and Administrative News (1959) p. 2322; Sen.Rep.No.187, 86th Cong., 1st Sess. p. 6.

By enactment of LMRDA in 1959, "Congress did seek to protect union members in their relationship to the union by adopting measures to insure the provision of democratic processes in the conduct of union affairs * * *." N. L. R. B. v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 194, 87 S.Ct. 2001, 2014, 18 L.Ed.2d 1123 (1967). "The Act is a first major step in the regulation of the internal affairs of labor unions. It expands the national labor policy into the area of relations between the employees and the labor union. Previously national policy was confined to relationships between management and unions." Cox, "Internal Affairs of Labor Unions Under the Labor Reform Act of 1959", 58 Mich.L.Rev. 819, 852 (1960). "The overriding purpose of the Labor-Management Reporting and Disclosure Act was to insure to members of unions their right to self-government and union democracy. The legislative history of the Act is replete with statements that its purpose was to return the control of unions to the rank and file members. It has been said that 'the election of officers is the heart of union democracy'. Title IV of the Act deals specifically with the conduct of union elections and is designed to guarantee to union members their freedom of choice in the selection of their officers." Sheridan v. United Brotherhood of Carpenters, etc., 306 F.2d 152, 158–159 (3rd Cir. 1962) (ftns. omitted). It is clear that the prior office holding requirement, in its actual operation and effect in this case, is repugnant to the purpose of the Congress in enacting Title IV of the LMRDA.

As the court so pointedly stated in Wirtz v. Local 153, Glass Bottle Blowing Ass'n, 244 F.Supp. 745, 749 (W.D.Pa. 1965) vacated 372 F.2d 86 (3rd Cir. 1966) rev'd 389 U.S. 463, 88 S.Ct. 643, 19 L.Ed.2d 705 (1968):

> Reasonableness is not to be assessed *in vacue*, but in the light of the purposes which the Congress sought to achieve and the evils which it sought to eliminate. Union democracy, effective self-government, abolition of oligarchical cliques and self-serving union officers were in the forefront of Congressional thinking. Section 401 itself seeks to open the path of eligibility to office to all union members in good standing,

except where restrictions of reasonable character, and uniformly imposed, may be appropriate. \* \* \* It must also be remembered that restrictions on eligibility also constitute a corresponding restriction on the right of choice by other members.

Congress was keenly aware of the fact that mere guarantees of the right to vote and fair balloting procedures would not provide a sufficient remedy for all the abuses cited. There had to be a guarantee, incorporated into Title IV, that union officials would be "responsive to the desires of the men and women whom they represent." U.S.Code Cong. and Adm. News (1959) pp. 2336; Sen.Rep.No.187, 86th Cong., 1st Sess. p. 20. Section 401 (e) of the Act [29 U.S.C. § 481(e)] was this guarantee. The crux of that guarantee is: "In any election required by this section which is to be held by secret ballot \* \* \* every member in good standing shall be eligible to be a candidate and to hold office (subject \* \* \* to *reasonable* qualifications uniformly imposed)". (Emphasis added.) It would be stretching credibility beyond its capacity for endurance to suggest that Congress intended the courts to sanction an amendment to a union constitution, adopted after enactment of the LMRDA, the effect of which was to reduce to a fraction of 1% the number of union members who could even qualify to challenge long time office holders.

■ In light of the foregoing considerations, this court holds that, in the circumstances of this case, the prior office holding requirement is unreasonable on four grounds: 1) it unduly restricts the number of union members eligible for the 8 national office positions; 2) when combined with the 5 year membership and group 1 shipping status requirements, it unjustifiably lengthens the number of years which must elapse before a seaman can qualify for national office; 3) the requirement does not result in candidates securing the experience and training necessary for one of the top

positions; and 4) the requirement frustrates the Congressional purpose underlying enactment of Section 481(e).

■ We have previously pointed out that this complaint was properly raised by union members who exhausted their union remedies. Haake tried to run for the office of president and was not allowed to do so because, although he had been a member for 23 years, he had not previously held office. For the same reason, Eylders, although he was a member for more than 5 years, was not allowed to run for national representative. Thus, the prior office holding requirement, a violation of Section 481(e), kept two prospective candidates from the ballot. Under these circumstances, this court finds there is a reasonable probability that this violation may have affected the outcome of the election. See Wirtz v. Local Unions 410, supra; Wirtz v. Local Unions 406, etc., supra.

### 9. *Failure to Elect Officers*

The Secretary contends that, in 1966, NMU failed to elect certain officers as required by 29 U.S.C. § 481(a) in that: 1) the field patrolman in Panama and the port agent in Yokohama were not elected; 2) the persons in charge of the ports in Greenville, Mississippi, Joliet, Illinois, Memphis, Tennessee, and Paducah, Kentucky, were not elected; and 3) patrolmen were not elected.[10]

In reply, NMU says only that patrolmen are not officers within the meaning of 29 U.S.C. § 481(a) and, therefore, in accordance with the desire of its membership, patrolmen need not be elected.

As set forth above, Article 11 of NMU's 1965 Constitution describes two classes of officers. In Section 1, the 8 national officers are described. In Section 2, all other officers are designated, consisting of (1) a branch agent of each branch; (2) field patrolmen as numerically and geographically determined by the national council; and (3) patrolmen as numerically and geographically determined by the national office, appointed

---

10. 29 U.S.C. § 481(a) is set forth in footnote 2, supra.

by the national president subject to the approval of the national office.

An election of NMU officers was held in 1956, 1958 and 1960 when all officers, including patrolmen, were elected for a term of two years. In December 1960, following the election of officers in April-May 1960, NMU's Constitution was amended to change the term of office from 2 to 4 years. Then, in 1962, all officers, including patrolmen, were elected for a term of four years. In 1963, the Constitution was amended to provide for the appointment of patrolmen. Consequently, in 1966, patrolmen were not elected.

NMU does not dispute the status of branch agents and field patrolmen; they are officers. The branch agent in Yokohama and the field patrolman in Panama were not elected in 1966. There are NMU representatives in Greenville, Memphis, Joliet, and Paducah, none of whom was elected in 1966. The NMU representative in charge of the port in Memphis was also the patrolman at Greenville (Answers to Plaintiff's Interrogatories 25 and 29).

Under the NMU Constitution (1965), the national council was empowered to define the status of each port as a branch or sub-branch, and to open and close branches or sub-branches whenever the needs of the union mandated such action. (Art. 7, Sec. 17.) The national council was also empowered to determine the number of patrolmen who shall be employed in any given branch (Art. 7, Sec. 18). Under the Constitution (1965), all persons in charge of ports are officers and members of the national council. (Art. 13, Sec. 5; Art. 5, Sec. 3.)

The duties of all officers of NMU are described in the Constitution (1965) Art. 13. The duties of those officials who are in charge of ports are defined in Art. 13, Sec. 5. The duties of patrolmen, who assist persons in charge of ports, are set forth in Art. 13, Sec. 6.

▮ This court construes 29 U.S.C. § 481(a) to mean that *all* officers of a union must be *elected* and that they must be elected at least every five years. It is conceded that field patrolmen and branch agents are officers in charge of ports and that in the 1966 elections the port agent in Yokohama and the field patrolman in Panama were not elected. Failure to elect these officers is, consequently, a clear violation of 29 U.S.C. § 481(a). This court is empowered to declare the 1966 elections void and to order a new election based upon failure to elect officers without the necessity of finding that this violation may have affected the outcome of the elections. 29 U.S.C. § 482(c). In this case, the court declares the 1966 election void for failure to elect the officers in charge of the ports in Yokohama and Panama and directs a new election for this reason.

▮ The next question is whether the representatives of NMU at the ports in Greenville, Memphis, Joliet and Paducah are also officers who should have been elected. In answers to interrogatories, NMU gave the names of those in charge of the ports in Greenville, Memphis, Joliet and Paducah. Under NMU's Constitution, officials in charge of a port are officers (Art. 13, Sec. 5); therefore, the failure to elect these officials, likewise, violated 29 U.S.C. § 481(a) and is a separate ground for ordering a new election.

We now turn to the office of patrolman. It is undisputed that patrolmen have not been elected since 1962. But the union argues strenuously that patrolmen are not officers as defined by 29 U.S.C. § 402 and are not required to be elected.

Section 402(n) defines, for the purposes of Section 481, "officer" to mean:

*Any constitutional officer,* any person authorized to perform the functions of the president, vice president, secretary, treasurer, or other executive function of a labor organization, and any member of its executive board or similar governing body. (Emphasis added.)

▮ This court holds that, under this definition, patrolmen are officers and

required to be elected at least once every five years.

First, patrolmen are "constitutional officers" in that they are labeled officers by the NMU Constitution, 1965, (Art. 11, Sec. 2) and their duties as "officers" are defined in the Constitution (Art. 13, Sec. 6).

Second, patrolmen acted as officers. It is undisputed that officials in charge of ports (agents if the port had the status of a branch, otherwise field patrolmen) were officers required to be elected. Appointed patrolmen were in charge of four ports, Greenville, Memphis, Joliet and Paducah. As officials in charge of these ports, these patrolmen did the work of officers in charge of these ports.

Third, until October 1966, patrolmen who were the officials in charge of ports sat on the NMU's governing body, the national council. (Constitution, 1965, Art. 5, Sec. 3.) There were three patrolmen in charge of four ports in 1966, i. e. Greenville, Joliet, Memphis, and Paducah. It was not until after the 1966 elections, i. e. October 1966, that the NMU Constitution was amended to eliminate appointed patrolmen in charge of ports from the national council. (Constitution, 1966, Art. 5, Sec. 3.) [11]

Finally, patrolmen are treated by the NMU as officers. As discussed, supra, one qualification for national office in the NMU is one prior full term as national officer, branch agent, field patrolman or patrolman (Constitution, 1965, Art. 9, Sec. 2). Although patrolmen were appointed, service as a patrolman for four years fulfilled this requirement in the 1966 elections.

Consequently, at the time of the 1966 election, patrolmen were officers within the meaning of 29 U.S.C. §§ 402(n) and 481(a). This court further holds that the NMU, by relieving the appointed patrolmen of their position on the national council, did not insulate them from the mandate of 29 U.S.C. § 481(a) and that patrolmen are still officers required to be elected.

Since patrolmen were not elected, and were required to be elected by § 481(a), this court finds that failure to elect patrolmen was a violation of § 481(a). This court directs the Secretary to conduct a new election, for all officers, including patrolmen. 29 U.S.C. § 482(c) (1).

11. The 1966 amendment reads:
 The National Council, which shall be composed of the National President, National Secretary-Treasurer, three Vice-Presidents, three National Representatives, all elected officers in charge of Ports or other replacements designated pursuant to Article 8, Section 9, shall be the governing body of the Union between Conventions.